IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**Michael Thomas Curtis**
(P.O. Box 613, Elkins, WV. 26241)

**Plaintiff,**

FILED
MAR 02 2017
U.S. DISTRICT COURT
ELKINS WV 26241

Vs.

Case No. 2:17cv17

**COMPLAINT**
**Jury Trial Demanded**

**Western Illinois University, Western Illinois University
Office of Public Safety, Jack Thomas, President; Vice Provost
Russ Morgan: Erskine Smith, Dean; Katrina Daytner, Assistant Dean;
Jill Jolene Myers, Director, in their Official Capacity; Kimberly Dodson,
Professor in the Law Enforcement and Justice Administration
Department, in her individual and Official Capacities.
(1 University Circle, Macomb, Ill. 60901)**

**Defendants.**

**JURISDICTION AND VENUE**

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 as amended. Jurisdiction is specifically conferred on this Court by 42 U.S.C. Section 2000e(5). Equitable and other relief are also sought under 42 U.S.C. 2000e(5)(g). Jurisdiction is also based on 28 U.S.C. Sections 1331, 1343 and 42 U.S.C. Sections 1981 et seq. The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims that arise under the laws of the United States.  The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different States and more than $75,000 is in controversy.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal-question claims that they form part of the same case or controversy.

## COMPLAINT

PLAINTIFF, Michael Thomas Curtis, *Pro Se*, sues Western Illinois University, and the above captioned Defendants, and avers the following in good support of this complaint:

## PARTIES

1. Plaintiff is Michael T. Curtis, *Pro Se*, who resides at P.O. Box 613, Elkins, West Virginia, 26241. Plaintiff is a resident of West Virginia and currently employed at Davis & Elkins College as an Assistant Professor of Criminology.

2. Defendant, Western Illinois University, is a Public University, Located and has its principal place of business at 1 University Circle, Macomb, Illinois, 60901.

3. Defendant Western Illinois University Office of Public Safety, is Located at 1 University Circle, Macomb, Illinois, 60901.

4. Defendant, Jack Thomas, is now and has been at all material times the President at Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

5. Defendant, Russ Morgan, is now and has been at all material times the Assistant Provost at Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

6. Defendant, Erskine Smith, is now and has been at all material times a Dean at Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

7. Defendant, Katrina Daytner, is now and has been at all material times the Assistant Dean, Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

8. Defendant, Jill Jolene Myers, is now and has been at all material times the Director, School of Law Enforcement and Justice Administration, Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

9. Defendant, Kimberly Dawn Dodson, Professor, School of Law Enforcement and Justice Administration, Western Illinois University, located at 1 University Circle, Macomb, Illinois, 60901.

## NATURE OF CASE

10. Michael T. Curtis, Plaintiff, was employed at Western Illinois University as an Assistant Professor of Law Enforcement and Justice Administration on August 20, 2014.

11. The discriminatory actions alleged against the Defendants, occurred on or about March 25, 2016 and continued until his wrongful termination on July 1, 2016.

12. The Plaintiff Filed charges with the Equal Opportunity Commission regarding the Defendants discriminatory conduct on or about November 15, 2016 with a Constructive Discharge date of July 1, 2016. (see Exhibit "1" attached)

13. The Equal Opportunity Commission sent a "Notice of Right To Sue", which was mailed on Thursday, December 1, 2016 and received by Plaintiff on Monday, December 5, 2016. (See Exhibit "2" attached)

14. The discriminatory acts that are the basis of this suit are as follows: Gender discrimination; Wrongful Termination based on discriminatory practices, Hostile Work Environment based on harassment and retaliation and supplemental and associated state tort claims arising out of the same controversy.

## CAUSE OF ACTION

## FACTS COMMON TO ALL COUNTS

15. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

16. Upon initial employment in August of 2014, Plaintiff was notified by Dr. John R. Schafer, F.B.I. Ret., Assistant Professor, School of Law Enforcement and Justice Administration, **(Hereafter L.E.J.A.)** to be wary and steer clear of Kimberly Dawn Dodson, L.E.J.A. professor. Mr. Schafer advised that he and Ms. Dodson were on the selection committee for Plaintiffs position. Dr. Shafer advised that Ms. Dodson was vehemently opposed to Plaintiff being hired. This put Plaintiff on notice to be cautious at all times with Ms. Dodson. Mr. Schafer further intimated that Ms. Dodson made a wild accusation against accusing him of being racist when he would not acquiesce to not hiring the Plaintiff. This accusation was ultimately withdrawn by Defendant Dodson, but appears to be a recurring theme in her interactions.

17. Plaintiff had zero contact with Kimberly Dawn Dodson over the next year and half, except to exchange pleasantries in passing or to be courteous in nature.

18. Plaintiff was an advisor for the Lamda Alpha Epsilon, Honors Fraternity, during the 2015-2016 academic school year. On or about late-February 2016, a controversy arose between the advisors of the fraternity and its members. The controversy involved the unlocking of a room to be utilized for meetings and advisor engagement. Specifically the complaint revolved around a colleague, Dennis Sorenson, a retired Illinois State Police Commander. A meeting was called with the officers of the Fraternity and the advisors. The problem seemed to be resolved through conflict resolution and mutual understanding.

19. It was learned the from another advisor of Lamda Alpha Epsilon, Assistant Professor Thomas Meloni, that both Defendant Kimberly Dawn Dodson and her husband, Assistant professor of L.E.J.A., Randall Sluss had begun to attend the meetings of the Lamda Alpha Epsilon fraternity and were acting as surrogate advisors. Neither of these individuals had been named as advisors to this Honors Fraternity.

20. On or about late-February, 2016, Defendant, Kimberly Dawn Dodson responded to Plaintiffs office. She stated that the fraternity members wanted to replace Professor Dennis

Sorenson as an advisor. Incredulous, as we had just had a meeting resolving this conflict, Plaintiff stated: "I'm confused, I thought we had resolved this issue." (This communication will be the subject of a subsequent defamation claim in which Kimberly Dawn Dodson claims to have been threatened by Plaintiffs behavior) Unbeknownst to Defendant, Kimberly Dawn Dodson, Professor Dennis Sorenson was standing outside of Plaintiffs office. The door was open, and Professor Sorenson was listening to the aforementioned conversation. At this time Professor Sorenson stepped in and said, "I should participate in this conversation since it is about me". The meeting concluded and Kimberly Dawn Dodson seemed apologetic about the situation and stated she was sorry to have been involved and that she was just informing the advisors of the complaint. These events were substantiated and corroborated by Professor Sorenson in a subsequent investigation.

21. As a result of the Lamda Alpha Epsilon officers undermining a colleague, failing to follow the chain-of-command and failing to mitigate issues with advisors, both Dennis Sorenson and Plaintiff resigned.

22. Shortly thereafter, Late February, Early March, 2016, both Professor Randall Sluss and Defendant Kimberly Dawn Dodson appeared at a meeting and addressed the members as their surrogate advisors. Professor Thomas Meloni, the remaining original advisor, relayed that Defendant Kimberly Dawn Dodson made statements in reference to the resignations of both the Plaintiff and Professor Sorenson. Professor Meloni found this to be highly offensive and disrespectful. As a result of this incident a complaint was filed with Director, Jill Jolene Myers. Director Jill Myers issued a decision and decree that there would be no new advisors to Lamda Alpha Epsilon.

23. It was this issue that precipitated the events which form the nature of this complaint. After this decree, Kimberly Dawn Dodson appeared to be angry with Plaintiff and refused to acknowledge or even exchange pleasantries with the Plaintiff.

24. On or about March 20-24th, 2016, Defendant Kimberly Dawn Dodson, Graduate Degree Coordinator of the L.E.J.A. Department, had a meeting with the graduate assistants. One of which was assigned to the Plaintiff; Patrick Morrissey.

25. In the aforementioned meeting, Defendant Kimberly Dodson lodged complaints with the graduate assistants about Plaintiffs music being too loud. Two of the graduate assistants approached Plaintiff and stated that they deemed this highly inappropriate. Ms. Dodson asked Plaintiff's graduate assistant, Patrick Morrissey to approach Plaintiff and request that the Plaintiff turn down his music as it was distracting to her. Patrick Morrissey, Plaintiffs Graduate Assistant, relayed this information to Plaintiff while playing a racquetball game at Western Illinois University. Mr. Morrissey indicated that he was uncomfortable with this request and was afraid that if he refused to pass on the message, it would place him in a precarious situation with Ms. Dodson. Plaintiff apologized to Mr. Morrissey for being placed in an awkward and uncomfortable situation.

26. On the morning of March 25, 2016, Plaintiff took time to place cardboard all over the slats to his office door to prohibit any music from emanating from his office. On the same day, at approximately 12:39 PM, Director Jill Jolene Myers, knocked on Plaintiff's office door. Plaintiff was not listening to music at this time. Plaintiff opened the door and Director Myers stated while rolling her eyes, "she was getting complaints about his music." In response to Director Myers, Plaintiff stated that he was confused as to why the Defendant refused to address him or resolve the issue as adults. Plaintiff then indicated he would approach Ms. Dodson and discuss the issue in reference to the complaints.

27. Prior to having this conversation with Ms. Dodson, Plaintiff requested that Constance Lincoln, Office Manager, observe and listen in on the conversation. This an effort to protect Plaintiff from any false accusations or any allegations of wrongdoing. Plaintiff made sure that Ms. Lincoln could physically see Plaintiffs location and hear Plaintiffs conversation. Plaintiff spoke loudly enough so that she could overhear the content. Unbeknownst to Ms. Dodson, Professor Barry McCrary was in his office and additionally heard the conversation that ensued. Professor Barry McCrary substantiated and corroborated the statements on behalf of Plaintiff. When Professor McCrary was advised of the complaint, he stated "that is just wrong, you never threatened her." **(see Exhibit "3", email dated 3-25-2016, 12:40 PM. attached)**

28. The content of the communication is undisputed and was corroborated by the two aforementioned witnesses. It is as follows: "I would appreciate that in the future, if you have a complaint about my music, that you address it with me… I don't know what backwater police department you worked for, but in the police department that I worked for, we resolved conflicts as adults. It seems to me that you have a problem undermining colleagues. " It is this communication that Defendant Kimberly Dawn Dodson perpetuated a complaint in which she claimed that she was threatened and assaulted. In her Facebook posting, she stated that she was "directly threatened" by Plaintiff. These publications are patently untrue and defamatory in nature. Plaintiff did not make entry into Defendant Kimberly Dodsons office. Plaintiff stood in the doorway, approximately 20 feet from Defendant, as to not invade personal space. Plaintiff did not want to provide the Defendant an excuse to allege a blatantly false claim. Plaintiff used no expletives or threatening gestures when speaking with Defendant Dodson. Plaintiff spoke loudly enough to be heard by Office Manager, Constance Lincoln.

29. It is the Plaintiffs contention that the statements made and substantiated by two witnesses, could not remotely be interpreted as a "direct threat", which was posted on Facebook. Plaintiff postulates that any objectively reasonable person would come to the same conclusion.

30. Defendant stated that the last time she attempted to confront Plaintiff with a problem, (referring to aforementioned L.E.J.A. Lamda Alpha Epsilon controversy), Plaintiff yelled at her. Plaintiff stated that she was misguided in her interpretation of those events. Defendant Dodson, stated "lets discuss it with the Director Myers." Plaintiff stated that "he had no problem with speaking with Director Myers." Defendant jumped up from her chair, Plaintiff

retreated back away from her, down the hall and into his office. Plaintiff deliberately maintained space and retreated in fear of retaliation and false claims and allegations.

31. The fabricated, retaliatory, and malicious false accusations, manifested themselves On March 30, 2016. On this date, Plaintiff, was notified via telephone call from Director Myers, who advised that Defendant Kimberly Dodson, had alleged a complaint against Plaintiff to the University, University Police, Equal Opportunity and Access and Deans Office. Plaintiff inquired as to the nature of the complaint and Director Myers stated that Plaintiff was being accused of threatening behavior. She also stated that a police report was filed with the Universities Office of Public Safety.

32. On March 30, 2016, Plaintiff sent an incident response and statement in reference to the aforementioned incident to Jill Myers, Director, School of Law Enforcement and Justice Administration. **(See Exhibit "4" attached)** In the first paragraph, Plaintiff references that "It is my understanding, although not confirmed by EOA, Office of Public Safety, or Dean's Office that there have been accusations and allegations made about me". In the second paragraph of "Exhibit 4", Plaintiff reiterated, "I have not been questioned, informed or advised of any pending actions against me." At that point, Plaintiff was operating on second hand statements and hearsay.

## COUNT I

### Violation of Title VII of the Civil Rights Act of 1964 as amended for employment discrimination based on sex.

33. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

34. On April 5, 2016, Defendant Kimberly Dodson received a uniformed police escort, from the Office of Public Safety, to her office in LEJA, due to her alleged fear of Plaintiff. This escort was allegedly for her protection against Plaintiffs alleged threatening behavior. This was a blatant attempt to humiliate and embarrass Plaintiff in front of students, staff, faculty, and administration. On that same day, Plaintiff was contacted by Dr. Terry Mors, former Department Chair of the School of Law Enforcement and Justice Administration. Mr. Mors informed Plaintiff that Kimberly Dodson was posting information online in reference to the incident that occurred on March 25, 2016. (Subject of a Defamation claim to be averred later in the Complaint). Mr. Mors was extremely concerned about the damage to Plaintiffs reputation and character, as well as the reputation and damage that it could do to the Law Enforcement program. He also stated that this public dissemination of the incident was a violation of school and ethical policies in reference to an open investigation. Mr. Mors advised Plaintiff that he had many altercations with Ms. Dodson, that she was often emotional and had recommended her not to be retained in her current position as graduate coordinator before he vacated his Chair. He had also stated that she had a history of being irrational and emotional. He further stated that he had called Dean Erskine Smith in reference to this incident, he had reported her

behavior on numerous occasions in the past, and that her conduct was often extreme and outrageous. Mr. Mors stated nothing was ever addressed in reference to these behaviors and his complaints went unaddressed. Mr. Mors stated that Dean Erskine Smith refused to speak with him or call him back in reference to her Facebook postings.

35. Defendant Kimberly Dawn Dodson Facebook post was as follows: "Gotta give a shout out to my mom today. I've had an extremely difficult week that was topped off with an outrageous display of threatening behavior against me by a coworker. Now I fear for my safety. I reported it to campus police and our office of EOA. Both handled it professionally so far but how can they assure me that this person won't harm me? I've been a nervous wreck ever since but my mom always has the words to calm me. I love you, Mom!!" **(See Exhibit "5" attached).** This statement was published to hundreds of friends on Facebook including current students and Graduate students, who knew the subject of the posting to be the Plaintiff. This posting was nothing short of character assassination by the Defendant. Plaintiff additionally learned via Facebook posts, that Defendant Kimberly Dodson had Ex Parte Communications with Provost Russ Morgan, on April 5, 2016. This meeting took place before Plaintiff's scheduled meeting with the Provost on April 6, 2016. Plaintiff was not offered an equal opportunity to meet with the Assistant Provost to lodge his counter-complaints. This would create an obvious conflict in Provost Morgan being impartial on hearing the evidence as he would be the senior member of administration involved in this incident. The published Facebook posting also indicated that a direct complaint of Plaintiffs alleged behavior had been reported directly to Andrea Henderson, office of Equal Opportunity and Access. Additionally, it stated that someone promised that the Plaintiff would "be moved". This is evidence of disparate treatment and patently discriminatory behavior perpetuated upon the Plaintiff based on gender. **(See above referenced "Exhibit 5).**

36. On April 6, 2016, Katrina Daytner, Associate Dean, requested that Plaintiff meet herself, Russ Morgan, Associate Provost, Erskine Smith, Dean, and Jill Myers, Department Chair to discuss the alleged incident and my follow up letter marked as exhibit "4". At no time during this meeting was Plaintiff ever notified of specific formal charges, EOA complaints or accusations leveled by Ms. Dodson. Ms. Dodson was refusing to come to work as a result of hear alleged fear of the Plaintiff. At that time, Plaintiff repeated his demand of a formal investigation into the matter and requested a formal written resolution. Plaintiff also demanded that disciplinary action be taken against the Defendant and asserted ethical violations based on her Facebook postings. Plaintiff further stated that nothing short of termination or formal discipline would be an acceptable resolution to this matter. Plaintiff reiterated the fact that this accusation was malicious and retaliatory. Plaintiff also stated that he would not be comfortable having any contact or communication with Ms. Dodson nor would he be comfortable working with her in any capacity as a result of her rogue actions.

37. On April 6, 2016, Plaintiff was met by Detective Zachary Scott Franklin, Office of Public Safety, Western Illinois University. Detective Franklin met Plaintiff at the School of Law Enforcement and Justice Administration. Detective Franklin asked to speak with Plaintiff in

reference to the incident in the presence of students, staff and faculty. This created extreme embarrassment and humiliation to the Plaintiff. Plaintiff could have been easily summoned to the Office of Public Safety with a phone call. This was the beginning of what Plaintiff believed to be collusive actions between the Office of Public Safety and Defendant Dodson. Plaintiff inquired as to the nature of the complaint and he stated he was investigating it as a disorderly conduct. This was directly contradictory to what Plaintiff had been advised by administration or allegations published by the Defendant on Facebook. Plaintiff asked Detective Franklin if detectives were usually involved in such a minor misdemeanor investigation. Detective Franklin shrugged his shoulders and did not answer the Plaintiff. Plaintiff stated that as an attorney, he could choose not speak with him in reference to this incident, but wanted to cooperate with the investigation, positive that he would be exonerated.

38. Plaintiff then inquired about Detective Franklins status as a student at Western Illinois University. Detective Franklin stated that he was in the graduate program. Plaintiff then asked him if Defendant Dodson had ever been his professor. Detective Franklin stated that he was her current student and in her class right at the current time. Plaintiff inquired as to whether or not he was contacted by the Defendant Kimberly Dawn Dodson personally, in which he did not reply and or pretended not to hear the question. Plaintiff requested this information via a F.O.I.A. request, but was not provided any information. Plaintiff was incredulous after learning the lead investigator was a current student of the Defendant Dodson. Plaintiff told Detective Franklin that his status as her current student was a direct conflict of interest and he could not be the investigator. Plaintiff requested the matter be handled by an outside agency, preferably the State Police. Unconscionably, Detective Franklin stated that he did not give thought to the conflict of interest and that Plaintiff raised a good point about the conflict. Plaintiff replied that he "gets paid to those types of issues and couldn't understand why he was continuing to investigate the claim." Plaintiff again adamantly requested that the state police be involved as a result of the apparent conflict. It is Plaintiffs contention in failing to address or remedy this unbelievably unethical conflict, he was treated disparately as a result of gender. It is Plaintiffs position that this request would have been granted had he been an aggrieved and victimized female. Plaintiff then gave his statement to Detective Franklin feeling no other option was available to him as a result of discriminatory practices.

39. The fear of collusion in the investigation caused Plaintiff extreme mental anguish as he knew that he was being treated unfairly and that the obvious conflict of interest was being ignored. Plaintiff felt that back door communicatons were being made between her current student, Detective Franklin and herself. Plaintiff knew he was not provided equal protection as a result of being male which further cemented Plaintiffs belief that his allegations were not being taken seriously or being considered by the University and its Office of Public Safety.

40. Detective Franklin then followed up with Constance Lincoln, witness to the incident, who reported his exact account of the events that transpired. Detective also followed up with Professor Sorenson, who corroborated the events surrounding this issue and relayed his

negative dealings with Defendant Dodson. Defendant Dodson was still refusing to come to work during this time as a result of her alleged fear of Plaintiff. Based on his investigation, Detective Franklin stated to Constance Lincoln that it sounded like she "needed to suck it up and come back to work!"

41. On April 6, 2016, flabbergasted and frustrated, Plaintiff contacted the Illinois State Police, District 14 Commander, Glenn Schwartz, to intervene in the Office of Public Safety Investigation. Plaintiff believed regardless of the outcome, the investigation was fatally flawed duet to the aforementioned conflict. Commander Schwartz spoke with Scott Harris, Chief of the Office of Public Safety. Pursuant to Commander Schwartz's conversation, relayed to Plaintiff by Commander Schwartz, Scott Harris, Chief of the Office of Public Safety, confirmed that there was no criminal conduct, nor would any charges be filed. The two witnesses to the event had confirmed Plaintiffs account of what had actually occurred. Commander Schwartz offered the assistance of the State Police due to the obvious conflict and was denied. Plaintiff feeling completely exonerated, was positive that disciplinary action would result against Ms. Dodson and complaints of retaliation, outrageous conduct, and ethical violations would finally be addressed. As a result of Plaintiffs disparate treatment, they were not.

42. On April 8, 2016, at 1:47 PM, Plaintiff, embarrassed, frustrated, angry and confused as to the status of his complaints, sent another email to Jill Myers, Department Chair. Again, Plaintiff reiterated that this was a formal complaint of retaliation and outrageous conduct. Plaintiff requested that it be forwarded to "OPS, EOA, Provost's Office, and Deans Office." Plaintiff informed Director Myers, that he "still had not been contacted by representatives of the EOA office for his complaints, nor advised formally of any EOA complaints made against him." Plaintiff also stated that none of his complaints had been addressed by administration in any response or communication whatsoever. **(See Exhibit "6" attached)**

43. On April 8, 2016, Plaintiff filed, via certified mail, a Cease and Desist Order in all defamation of Michael Thomas Curtis' character and reputation. This was accompanied by face-book postings made by Ms. Dodson in reference to the pending investigation. Plaintiff was mortified by the shocking and unfounded accusations being published to current students and graduate students. Ms. Dodson had stated that she did not feel safe anymore and was attempting to apply for a restraining order against the Plaintiff. **(See exhibit "7" attached) (See formerly attached exhibit "5" attached)**

44. On April 8, 2016, as a follow up to my email on same day, Plaintiff was requested to attend a meeting with Provost Morgan, Dean Smith, Associate Dean Daytner, and Department Chair Jill Myers, on April 11, 2016.

45. On April 11, 2016, Plaintiff met with Defendants Provost Russ Morgan, Dean Erskine Smith, Associate Dean Katrina Daytner, Department Chair Jill Myers and Professor Kimberly Dodson. Plaintiff was accompanied by Dr. Richard Filipink, Union Representative at Plaintiffs request.

46. The meeting was opened by Provost Russ Morgan.  Provost Morgan requested that we reach a "reasonable resolution to this issue."  Provost Morgan asked if anyone wanted to speak first.  Plaintiff and Defendant Dodson Declined to speak.  Provost Morgan implored both parties to resolve the conflict and attempt a reconciliation.   Plaintiff in response to Provost Morgan, stated that it was too late for reconciliation.  He had been publicly smeared on Facebook by unfounded and outrageous accusations.  Plaintiff averred that he was the aggrieved party based on the outrageous, extreme and retaliatory behavior perpetuated by Defendant Dodson.  Plaintiff further alleged that extreme damage had been done to his character and reputation among the campus community.  Plaintiff then confronted Ms. Dotson about her face book postings.  Provost Morgan asked why she was commenting on the incident, she stated because "she could and no one could stop her".  Provost Morgan stated, "Yeah, but isn't that bad for the college and not a good idea".  She remained silent.  Plaintiff advised her of her cease and desist letter in reference to her Facebook postings. Defendant Dodson asked if she "needed a lawyer?"  Plaintiff stated that she did.  Plaintiff at that time stated to the group of administrators in the room that the Facebook posting were ethical violations of Western Illinois University policies on maintaining confidentiality on pending investigations.  Plaintiff stated that he counted at least eight ethical violations that required discipline.  This statement was ignored.  Plainfiff then averred, for the fourth time, in the presence of all the administrators in the room, that he had not been not been contacted by EOA or had is complaints addressed adequately.  Plaintiff reiterated that he had not been formally advised of any accusations against him.  Plaintiff demanded that that disciplinary action be taken against Ms. Dotson based on the outcome of the investigation.  Defendant Dodson stated:  "I have OPS investigating."  Intimating her close and collusive relationship with the investigator Detective Franklin.  Provost Morgan then stated that the "investigation was over and that they were not recommending any charges, but they were thinking about forwarding to the prosecutor."  Plaintiff knew this not to be false based on his conversation with Commander Schwartz and that Provost Morgan was placating and cowering to the Defendant Dodson.  Plaintiff demanded Provost Morgan to rephrase that it was unfounded, at which time he rephrased.  Plaintiff then stated that he contacted the State Police due to the obvious and patently discriminatory conflict of interest.  This concerned everyone in the room.  Provost Morgan said, "You mean Office of Public Safety" and Plaintiff replied:  "No, I mean State Police!"

47. Plaintiff reiterated that regardless of the findings of the Office of Public Safety, there was a blatant conflict of interest that the University was ignoring and any finding, favorable to Plaintiff or not were fatally flawed as a result of this conflict.  Plaintiff also stated that this relationship caused severe emotional trauma to the Plaintiff.  Plaintiff further averred that if he were female, the conflict would have been rectified immediately.   Ms. Dodson became Irate and asked why the Illinois State Police was involved.  Plaintiff stated that filing a false police report in the State of Illinois was a crime.  Defendant Dodson then stated that assault was "subjective" to the person hearing the words and that based on my size and demeanor she was afraid of Plaintiff.  Plaintiff inquired as "how an outrageous display of threatening behavior", as

alleged in her Facebook Posting needed to be subjective? Plaintiff and Jill Myers, Attorneys, corrected her stating that it is an "objective reasonableness standard" and no objectively reasonable person could have come to her outrageous conclusion. At that time, Kim Dodson, became irate and furious, she started gathering her belongings and using expletives. Associate Provost Morgan again tried to placate and cower to her behavior, begged her to stay in the meeting. Defendant Dodson, stormed out of the meeting against the objection of Provost Morgan repeatedly begging her to stay. Plaintiff inquired as to whether or not "he would have been begged to stay?" Plaintiff the raised his arms in the air, in reference to the exhibition of irrational and irate behavior that had just been displayed by this rogue and irrational individual. All of the Administrators in the room were dumbfounded by the actions of Defendant Dodson. Plaintiff believed his allegations of extreme and outrageous behavior had been demonstrated first hand to the administrators in the room. Plaintiff also stated that this was the same behavior that had been complained about by other faculty members and the former Department Chair Terry Mors. Plaintiff implored the administrators to walk around the LEJA office, speak to other professors and then tell Plaintiff who the source of all the problems were. Again, based on gender, this statement was ignored.

48. Plaintiff reminded Dean Smith that Terry Mors, former Chair, had alleged multiple complaints about her behavior in the past which had gone ignored. Plaintiff then stated his complaints over again. Plaintiff requested an independent investigation be conducted, disciplinary action, up to termination be taken and Plaintiff would not be satisfied until her ethical violations, pursuant to Western Illinois University Policy were addressed.

49. Plaintiff asserted disparate treatment, stating that they took her unfounded accusations, ran with it, and ignored Plaintiff accusations. Plaintiff asserted that he had been emotionally damaged by these accusations, his reputation and character had been destroyed by these retaliatory and vindictive allegations. Plaintiff challenged the Administration to do something! Plaintiff inferred that there was as much liability in failing to act as there was in acting. In their effort to placate an obviously irrational individual would backfire on them. Plaintiff implored the administration for a resolution and relief to these unfounded accusations. Plaintiff alleged that irreparable harm had been done to his reputation and character by these outrageous claims. Jill Myers, Department Chair, stated, to the dismay of the Administrators in the room, and in Plaintiffs presence, that she "needed to be disciplined and at least suspended." She further stated that she told the administration that the Defendant Kimberly Dodson was the initiator and instigator of this incident. Plaintiff was immediately asked to leave the room by Assistant Provost Morgan, he obviously did not like this statement being made in front of the Plaintiff.

50. Dr. Richard Filipink, union representative, exited the room, had a conversation with the Plaintiff and advised that he would be advised of the outcome in writing. He additionally requested that he file a Formal Complaint, to Rica Calhoun, Ethics Officer to have his complaints addressed formally. Plaintiff stated that he had followed the chain of command to file my

complaints through the administration. He seemed to lack faith in the administration and requested that Plaintiff file it directly. On April 12, 2016, Plaintiff filed a formal complaint to Rica Calhoun, Ethics Officer. Much to Plaintiffs dismay, he never received a call back, a letter of acknowledgment, a disposition, an investigation, addressed or followed up with by Ms. Calhoun. Defendant Dodson to Plaintiffs knowledge received zero discipline. In short, because of his gender, Plaintiff was completely ignored and did not have any grievances redressed properly. This was approximately the 5th time Plaintiff had asked the administration or the Ethics Officer to address his grievances. **(See Exhibit "8" attached)**

51. Plaintiff was absolutely and 100% ignored based on sex. Plaintiff was not asked one question in reference to his complaints based on retaliation. Plaintiff is a male party and therefore was not treated equally or extended the same considerations as the female party to this incident. Ms. Dodson's complaints were immediately addressed, an investigation by Western Illinois's Office of Public Safety conducted and meetings with administration held. Plaintiff received disparate treatment before any follow up or investigations conducted. Based on this disparity, there was an obvious lack of interest in hearing Plaintiffs version of the events that occurred. Plaintiff implored the administration to begin and start their investigation with the two parties that were direct witnesses to the interaction. There was no intention to hear Plaintiffs claims nor investigate them as evidenced by lack of any substantiation or formal responses, per Plaintiff's express requests on at least two previous occasions to Plaintiffs chain of command. This is patently disparate treatment based on Western Illinois Policy and the EOA complaint process. To date, Plaintiff has never received any finding or dispositions in any of the asserted complaints, by either the Plaintiff or Defendant.

52. For the foregoing reasons, it is Plaintiffs contention that he was treated with disparity based on his gender. Plaintiff was retaliated against, as a result of being hired against the wishes of Ms. Dodson and as a result of the Lamda Alphe Epsilon advisor issue.

53. Plaintiff intends to show that his complaints and requests for a remedy were blatantly ignored based on gender. It is Plaintiffs position that he was denied due process and treated unequally based on gender. Plaintiff was never provided a copy of the investigation conducted and final disposition reached by the administration. To date, Plaintiff has no information on disposition of the incident which has caused major anxiety Plaintiff. It also made Plaintiff feel that his position as an Assistant Professor of Law Enforcement and Justice Administration at Western Illinois University tenuous at best.

## COUNT II
## WRONGFUL TERMINATION

54. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

55. On April 15, 2016, approximately 5 days after the meeting with Administration, Plaintiff inquired as to the disposition of the administrative investigation and resolution of the incident.

Plaintiff felt, although flawed, he had been completely vindicated of any wrongdoing. This was substantiated by the follow up by the Illinois State Police, which Plaintiff believes that forced the Office of Public Safety to act ethically, while embroiled in a major conflict of interest. It was Plaintiffs understanding that a written resolution would be provided in a timely manner. On this date, Plaintiff was advised by Jill Myers that Defendant Kimberly Dodson would be allowed to teach from home for the rest of the semester. Plaintiff was concerned and upset that this may be a tacit admission or an administrative finding of fault or liability on Plaintiffs part. Plaintiff requested documentation to show how the administration came to this conclusion. Plaintiff was also confused as to why he was not offered the same accommodation. Plaintiff was assured by Director Myers that the administration was required to write a formal investigative report and resolution and provide a copy to the Plaintiff. Plaintiff was assured that these items were forthcoming. Plaintiff further inquired of Director Jill Myers if anything negative had been entered into his file. Director Myers stated that nothing negative had been entered into his file. Plaintiff inquired about the EOA complaints, both Plaintiffs and Defendants, Director Myers again reiterated that Plaintiff would be given a disposition and final report from both by both EOA and the Deans Office.

56. On May 1, 2016, approximately 2 weeks after the meeting with the administration. Plaintiff again spoke with Director Myers, inquiring as to the status of the investigation and any findings. Plaintiff again formally requested a disposition and finding. Director Myers stated Defendant Kimberly Dodson was being forced to work from home. Plaintiff stated that he did not feel that this was discipline. He further averred that this accommodation painted Plaintiff in a bad light with the staff, faculty and administration as the guilty party. It appeared to Plaintiff, after everything, that Kimberly Dodson was given an accommodation after all of her allegations had been unfounded and Plaintiff was provided with no resolution or remedies to his complaint. Plaintiff felt that he should have been offered the same accommodation. Plaintiff was segregated from the Defendant Kimberly Dawn Dodson. Plaintiff believed that this created a strong suspicion of culpability amongst the university community. Plaintiff asked Director Myers if the administration wanted him to leave the university, which was the only explanation of their disparate and disproportionate treatment. Jill Myers in response to this inquiry stated, "the administration is terrified to do anything".

57. Approximately 4 weeks later, May 15, 2016, Plaintiff Spoke with Jill Myers, and advised that he still had not received any reports or investigation materials in reference to the incident. Again, Plaintiff reiterated that he felt that he was being treated unfairly and that he was being forced out of his position. Director Myers stated that she had spoken with the Administration and told them that they were required to provide him with investigation results and disposition. She was not confident that they would comply with this requirement. Plaintiff at this time felt that the negligent, reckless and intentional failure of the administration to provide closure of investigative findings, notify him of disposition, address his complaints, and failure to discipline the Defendant Kimberly Dawn Dodson, placed Plaintiff in a disadvantageous and negative position. Plaintiff believed his position was extremely tenuous at best. It was the Plaintiffs belief that this intentional omission was to force one or both of the parties involved to resign their position. Plaintiff felt that his career at Western Illinois University had been completely

ruined by these false and tortious accusations. Substantiating this intentional, reckless and negligent omission was the fact that Rica Calhoun, ethics officer, had never responded to, or acknowledged Plaintiffs formal complaints, which pursuant to union representative, be directly to her. It was obvious to the Plaintiff that he was being constructively discharged, forced to resign and kept in the dark as to the disposition or finding of the incident. It was also obvious that his direct challenge to authority was not well received. Plaintiff was distraught as a result of these intentional actions.

58. On June 1, 2016, approximately 7 weeks after the final meeting with the Administration, Plaintiff Spoke with Jill Myers again in reference to the failure of the administration to provide him with a finding or final disposition to the aforementioned incident. Plaintiff told Jill Myers that he could not and would not work with Kimberly Dodson in any capacity. Plaintiff stated that he feared having any contact with Ms. Dodson. This terrified the Plaintiff so much that he began to film himself walking in and out of the building and getting on the elevator in fear that he may inadvertently run into Ms. Dodson. Ms. Dodson was allowed to come in on the weekends to teach a graduate class, which seemed to be a contradictory accomodation. Plaintiff was now sure, based on the aforementioned intentional omission, that he was being constructively discharged from his position. Plaintiff believed that there was no other possible explanation as to the reason why, for almost 7 weeks, that there had been no closure, complaints addressed, discipline or final determination in the matter. At this time, based on the intentional acts of the University, Plaintiff started actively seeking and applying for other positions.

59. This incident did immeasurable damage to Plaintiffs career. Plaintiffs career path and goals have been altered forever. Plaintiff absolutely loved his job at Western Illinois University. Based on these unfounded accusations, what was once a promising career at WIU, leading to eventual Directorship of an elite program, were destroyed. Although Plaintiff was exonerated of these accusations and Plaintiffs version of events were corroborated. Plaintiff felt compelled to leave. Plaintiff left the college based on the intentional, reckless and negligent failure of and failure of WIU to investigate his claims impartially and without gender bias.

60. Plaintiff was teaching in the largest Law Enforcement and most distinguished program in the State of Illinois. Plaintiff had already been approached and identified as a future program Director. Plaintiff was in the 5th largest program in the United States with approximately 2200 majors and minors. Plaintiff was by far the most popular and accessible professor in the department. This was Plaintiffs dream position. Plaintiff now teaches at a private college, an unrecognized leader in the field, in the middle of remote Appalachia, with approximately 65 majors and minors, earning significantly less than his previous position.

## COUNT III
### Hostile Work Environment

61. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

62. On July 1, 2016, approximately 11 weeks after the incident, extremely frustrated with the negligent, reckless and intentional omissions and affirmative actions of the administration, Plaintiff accepted another position as an Assistant Professor of Criminal Justice.

63. To date, Plaintiff has never been notified or provided a copy of any accusations, allegations, or EOA complaints.  Plaintiff has not received any dispositions of these events, as promised on multiple occasions.  Plaintiff, other than a compromised police report, has no disposition of the investigation conducted by the administration.  Plaintiff is aware that one party was provided a four-week vacation working from home, because of her gender, while Plaintiff went to work every day, in a hostile environment created by the Defendants.  Plaintiff withstood rumors and speculation on a daily basis while working in an adversarial environment.  Plaintiff was subjected to scorn and ridicule on a daily basis.  Plaintiff endured whispers from students, staff and faculty that he was assaultive and violent.

64. Plaintiff received no redress or acknowledgment of his grievances based on his gender.  This created an environment where it was impossible for the Plaintiff to work effectively.  In fact, based on Plaintiffs disparate treatment, he was viewed as a guilty party because Defendant Dodson was given a special consideration to work from home.  Defendant Dodson was the individual directly responsible for the harassment that occurred in the workplace.  Plaintiff received disparate treatment, segregation from Defendant and had his work culture and environment change based on the omissions and lack of action, perpetuated by the Defendants in creating a hostile work environment.  Plaintiff's complaint to the ethics officer, which went unacknowledged is all the evidence to prove disparate, unequal and hostile actions by the university and its officers.  Plaintiff avers that all of these actions were discriminatory in nature.

65. Plaintiff was retaliated against and harrassed, as a result of being hired against the wishes of Ms. Dodson and the outward challenge to her authority in the Lamda Alpha Epsilon issue.  Plaintiff was subjected to an adverse and hostile work environment as a result of a known and unaddressed behaviorally challenged employee.  Plaintiff intends to proffer that this intentional, reckless and negligent behavior perpetuated by Western Illinois University, its agents and officers, not only violated federal law under Title VII and EEOC, but cultivated and created a hostile working environment which changed and altered working conditions which constructively discharged the Plaintiff.

66. Defendants are in direct violation of outlined policies and procedures in their complaint and resolution process, which are policies developed and to be followed by the University.  Defendants created an impossible and hostile working environment for the Plaintiff as a result of their intentional, reckless and negligent omissions and actions.

**COUNT IV**
**Negligent Infliction of Emotional Distress (Supplemental State Tort Claim)**

67. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

68. Defendant Kimberly Dodson's extreme and outrageous behavior is a pattern established through the entire complaint. Defendant Dodson made false statements that no reasonable person could have interpreted as "extreme outrageous and threatening behavior" and were a direct result of retaliatory and harassing behavior. The response or lack thereof by Western Illinois University and its administrators to the complaints averred by the Plaintiff were extreme and outrageous. Western Illinois University and its administrators blatantly refused to address Plaintiffs complaints, provide him with a disposition or discipline Kimberly Dodson pursuant to the Department Chair Jill Jolene Myers recommendation; the individual most intimately familiar with both parties. The very fact that Rica Calhoun, Ethics Officer, failed to responds to Plaintiffs direct complaint is blatantly extreme and outrageous conduct. The fact that the Western Illinois University Office of Public Safety allowed a current student of Defendant Kimberly Dodson to be the lead investigator on the incident in a patent a conflict of interest, is extreme and outrageous behavior perpetuated by the University.

69. The only conclusion that can be drawn from the aforementioned actions of the defendants, is that the above named defendants intentionally, recklessly or consciously disregarded the probability of causing emotional distress to Plaintiff. Plaintiff on multiple occasions, through email, written response and in meetings averred publicly that he was manifesting emotional and physical difficulties as a result of the intentional and reckless acts of all the defendants in this case. He averred that he was losing weight, couldn't sleep and was humiliated by these actions. Defendant was completely embarrassed to come to work or face officers of the Public Safety Department. Defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress to the Plaintiff.

70. Plaintiff lost approximately 25 pounds over the three-month period preceding his constructive discharge and wrongful termination. Plaintiff, 44 years old, for the first time in his life, responded to a doctor and took medication as a result of the anxiety and stress he was placed under as a result of the intentional, reckless and negligent actions perpetuated by the defendants. Plaintiff was given a prescription to address his severe emotional distress. This issue created extreme embarrassment to the Plaintiff, mental anguish and was nothing short of character and intentional career assassination by the Defendant Kimberly Dodson. Defendant Dodson was emboldened and facilitated by Western Illinois University, Office of Public Safety, and Administrators. Plaintiff to date continues to suffer emotional distress as he believes his career path has been negatively and permanently altered. Plaintiff contention is that the Facebook postings perpetuated by Defendant Dodson, were an intentional and calculated action to cause severe emotional stress to the Plaintiff. Plaintiff has been devastated personally and professionally by these actions and the direct failure of Western Illinois University to properly address his grievances and provide any type of discipline, closure or remedy.

71. Defendants were the direct and proximate cause of Plaintiffs emotional distress. The fact that they never addressed Plaintiffs claims, allowed a current student of one of the defendants

to be the lead investigator of the incident and constructively discharging Plaintiff by failing to provide a disposition actually and proximately caused the plaintiff's emotional distress.

## COUNT V
### Defamation (Supplemental State Tort Claim)

72. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

73. Plaintiff sues Kimberly Dawn Dodson and Western Illinois University under this count. It is Plaintiffs contention that under the doctrine of respondeat superior, Kimberly Dawn Dodson used her power and influence as a graduate program coordinator and tenured professor to perpetuate her falsehoods to the detriment of the Plaintiff. It is further alleged that these statements were ultimately sanctioned by Provost Morgan, when he refused to address them properly and request that they be removed from Facebook, which was a direct and proximate violation of Western Illinois University policy.

74. The content Defendant Kimberly Dawn Dodson Facebook post is as follows: "Gotta give a shout out to my mom today. I've had an extremely difficult week that was topped off with an outrageous display of threatening behavior against me by a coworker. Now I fear for my safety. I reported it to campus police and our office of EOA. Both handled it professionally so far but how can they assure me that this person won't harm me? I've been a nervous wreck ever since but my mom always has the words to calm me. I love you, Mom!!" **(See formerly referenced Exhibit "5" attached).** This statement was published to hundreds of friends on Facebook including current LEJA students and Graduate students who knew the subject of the posting to be the Plaintiff. It is this posting that provided all of the information provided to Plaintiff throughout the investigation process. This posting was on the world wide web and was published to hundreds of followers.

75. The subsequent investigation confirmed exactly what was said by Plaintiff. Plaintiffs account was replicated exactly by Constance Lincoln, office manager, who substantiated Plaintiffs actions and confirmed that no threatening behavior or gestures were made by the Plaintiff. **(See Police Report Attached as Exhibit "9")**

76. The fact that the Defendant was the subject of "extreme and outrageous threatening behavavior" by the Plaintiff is a blatant falsehood and premeditated to cause severe damage to Plaintiffs reputation. The results of the investigation proved to be that no reasonable person could have interpreted the words to be threatening in nature. This falsehood was made maliciously, in retaliation and to damage and destroy Plaintiff's career. It was Published on Facebook for hundreds to see.

77. In the aforementioned Police Report, Plaintiff made further statements that Plaintiff "used expletives, through his pen down, pointed at her, screaming and called for Dennis Sorenson to come into his office." Interestingly, Defendant had never reported this alleged conduct in a

police report until weeks later. This is a direct falsehood, which Professor Dennis Sorenson himself has refuted via the investigation conducted. Plaintiff never used an expletives, never pointed at the Defendant in a threating nature. Professor Dennis Sorenson heard the entire conversation and entered the office stating "since this is about me, I should probable step in." This is another direct and blatant fabrication that will be disputed by a first hand witness to the event. Pursuant to the Police report, all of Plaintiffs claims were substantiated by witnesses, who will testify at trial.

78. The Statements, individually and collectively, referred to herein have caused, are causing, and will cause Plaintiff to suffer injury to his professional standing, to his reputation and good name; and, they have held and will continue to hold Plaintiff up to public scandal and ridicule. The Statements were calculated to, and do, expose Plaintiff to public scorn, hatred, and ridicule. By such published Statements, Defendants did injure the Plaintiff's reputation within his professional circles and in the community at large. The publication of the Statements proximately caused general and special damages to the Plaintiff. The Statements have adversely impacted Plaintiff's scholarly credibility.

79. The statements that appear in the police report appear to be privileged, pursuant to Illinois law, however statements to faculty, administration and staff via Facebook are not. The publication of the communication on Facebook was not based on reasonable grounds by the defendant. Defendant herself knew the publication to be false. Defendant was never threatened, nor was it averred that she was threated on the date and time mentioned in the police report. The incident she was referring to happened weeks earlier but was postulated to have happened on March 25, 2016. Defendant referenced back to the Lamda Alpha Epsilon incident which Plaintiff alleged earlier in this complaint in her facebook posting. This was calculated to destroy Plaintiffs reputation and character. This publication was made with actual malice and with the direct intent to destroy and derail Plaintiffs career.

## COUNT VI
### Defamation Per Se (Supplemental State Tort Claim)

80. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

81. These false Statements published on Facebook impute to Plaintiff a criminal violation of Assault, under Illinois State Law, 720 ILCS 5/12-1 for which, if true, is a class C misdemeanor and may be may be punished by a fine and up to 30 days imprisonment.

82. Defendant was never threatened, nor was it averred that she was threated on the date and time mentioned in the police report. Defendant referenced back to the Lamda Alpha Epsilon incident which Plaintiff alleged earlier in this complaint in her Facebook posting. This was an opportunity to seize that event and state that she had been directly threatened on March 25, 2016. This is a calculated statement to destroy Plaintiffs career and reputation. This

publication was made with actual malice and with the direct intent to destroy and derail Plaintiffs career. The threatened conduct will be refuted by Professor Dennis Sorenson at trial, as they never happened.

83. The Statements, individually and collectively, referred to herein have caused, are causing, and will cause Plaintiff to suffer injury to his professional standing, to his reputation and good name; and, they have held and will continue to hold Plaintiff up to public scandal and ridicule. The Statements were calculated to, and do, expose Plaintiff to public scorn, hatred, and ridicule. By such published Statements, Defendants did injure the Plaintiff's reputation within his professional circles and in the community at large. The publication of the Statements proximately caused general and special damages to the Plaintiff. The Statements have adversely impacted Plaintiff's scholarly credibility.

84. It is further alleged that these statements were ultimately sanctioned by Provost Morgan when he refused to address them properly and request that they be removed from Facebook as a direct and proximate violation of Western Illinois University policy.

## PRAYER FOR RELIEF

85. Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs in this complaint.

86. WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:
A. (i) for compensatory damages in the amount of Four-Hundred Thousand Dollars ($400,000.000) on Count I, II and III. (ii) General and Special compensatory damages of Eight-Hundred Thousand Dollars (800,000.00); (iii) punitive damages in the amount of $2 million ($2,000,000.00) on Count I, II and III, IV, V and VI. (iv) both pre-judgment and post-judgment interest on all Counts, and, (v) such other and further relief as this Court finds just and equitable.
B. Trial by jury on all issues so triable;
C. Award to Plaintiffs of reasonable attorneys' fees and costs incurred in
connection with this action from the Defendants pursuant to 42 U.S.C. §1988;
and,
D. Such further and different relief this Honorable Court deems just and proper.

Date: 3-2-17

Respectfully Submitted:

_____
Michael T. Curtis, Pro Se, Plaintiff
412-731-4638

**DECLARATION UNDER PENALTY OF PERJURY**

The undersigned declares under penalty that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained therein is true and correct. 28 U.S. C. §1746; 18 U.S.C. §1621.

Executed at Elkins, West Virginia, Randolph County, on March 2, 2017.

Michael T. Curtis, *Pro Se*, Plaintiff